UNITED STATES of America,
Appellee,

v.

Earl MISSLER, Appellant.

No. 12757.

United States Court of Appeals
Fourth Circuit.

Argued June 10, 1969.

Decided Aug. 25, 1969.

Edward L. Genn, Washington, D. C. (Brown, Genn & Brown, Washington, D. C., on brief), for appellant.

Paul M. Rosenberg, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., and Clarence E. Goetz, Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and WINTER, Circuit Judges.

SOBELOFF, Circuit Judge:

This is Earl Missler's appeal from his conviction by District Judge Northrop, sitting without a jury, for violating the federal "obstruction of justice" statute, 18 U.S.C. § 1503. The indictment charged that he did "corruptly endeavor to influence, obstruct, and impede the due administration of justice" by hiring and paying sums of money to Vincent Ferrara to cause the murder of or serious injury to Richard O'Keefe.

The genesis of the alleged offense was in an earlier indictment against the appellant and others for hijacking a truck carrying a large quantity of cigarettes in an interstate shipment from Greensboro, North Carolina, to Brooklyn, New York. O'Keefe was one of Missler's co-defendants in that case, and he was expected to testify for the Government against Missler.

The Government offered testimony tending to establish the following: On July 5, 1967, 565 cases of Kent cigarettes were hijacked from an interstate shipment of P. Lorillard Company moving from Greensboro, North Carolina, to Brooklyn, New York. The Federal Bureau of Investigation began an investigation of the theft which led to the arrest in October, 1967, of Horace England and Richard O'Keefe. The investigation continued following these arrests.

On December 15, 1967, Missler and O'Keefe met at the home of Vincent Ferrara. On that occasion Missler and O'Keefe quarreled; O'Keefe angrily accused Missler of falsely denying complicity in the hijacking, and warned him that "if I go away [to jail], you know we're all going to go away."

Just four days later, on December 19, 1967, appellant Missler and O'Keefe were both indicted. Indicted with them were Horace England, William Harmatz and Milton Kind. Missler was arrested on the same day at his home by F.B.I. Special Agents David E. Faulkner and Gail T. Cobb. It is undisputed that before taking Missler to the F.B.I. office, the agents informed him of the charges, gave the required *Miranda* warnings, and permitted him to make a telephone call. The officers and their prisoner then repaired to the F.B.I. headquarters. The transcript of Agent Cobb's testimony on direct examination contains the following:

Q. Now, what, if anything, sir, happened on the trip to the F.B.I. office?

THE WITNESS: (Agent Cobb) I was sitting in the back seat with Mr. Missler. David Faulkner was driving. At some time en route to the F.B.I. office, Mr. Missler asked if he could— if I would tell him one thing, and I said if I could.

He asked the question, did O'Keefe tell you I was involved in this case?

I said, I can't tell you that. I will tell you, the F.B.I. can't go around arresting someone on one individual's say-so alone, it has to be corroborated.

Mr. Missler nodded his head and said, you've answered my question.

After processing, Missler was released on bond. Eight days later, on December 27, 1967, according to the testimony of Ferrara, Missler met with him for the purpose of discussing the elimination of O'Keefe, the prospective government witness against Missler. They agreed that Ferrara would arrange for the sum of $4,000 to have O'Keefe killed. No money changed hands on that date, but during the first week of January, 1968, Missler made payments of $1,000 and $500 to Ferrara.

On January 9, 1968, Ferrara phoned the F.B.I. about the O'Keefe "contract." Ferrara informed Agents Faulkner and Cobb that he expected Missler to visit him that morning for the purpose of making an additional payment, and he invited them to come to his home. The agents reported the call from Ferrara to the United States Attorney who advised them to accept Ferrara's invitation. Accordingly, they went to Ferrara's and secreted themselves at the head of the stairs leading to the second floor. Missler arrived soon thereafter, and the agents heard him confirm Ferrara's story about the agreement Missler had made with him to have O'Keefe murdered. In the course of the conversation, Missler paid Ferrara an additional $500, warned him that O'Keefe carried a gun, and promised that he would take care of Ferrara's family if anything happened to him. At trial Ferrara testified to this conversation, and Agents Cobb and Faulkner corroborated him in all respects.

Taking the stand in his own behalf, appellant denied ever having arranged with Ferrara for the killing of O'Keefe. His version was that there was an agreement between O'Keefe, Ferrara and himself to "shake down" Harmatz, a codefendant in the hijacking case, for a sum of money in return for assurances that they would not implicate him in the hijacking. Missler admitted having given Ferrara $500 in the course of the January 9, 1968 meeting at Ferrara's home as Ferrara and Agents Cobb and Faulkner had testified. Missler's explanation, however, was that this was a division of the proceeds of the shakedown of Harmatz, not a payment on a contract on O'Keefe's life. Numerous character witnesses were also called by the defense; and the Government offered O'Keefe and England as rebuttal witnesses to substantiate its theory of the case.

At the conclusion of the testimony, the District Judge found appellant guilty. Sentencing was deferred pending defendant's motion for a new trial. The motion was denied on August 15, 1968, and a maximum sentence of five years was imposed. Another motion for new trial, this one on the ground of newly discovered evidence, was filed by appellant, and the District Judge ordered an evidentiary hearing, which was held on March 6, 1969. Conflicting affidavits were submitted for the court's consideration. In one of these, dated November 27, 1968, and offered by the defendant, Ferrara asserted that his testimony at trial had been false and that Missler never hired him to arrange for the killing or injuring of O'Keefe. In the other affidavit, dated January 29, 1969, and offered by the Government, Ferrara affirmed the truth of his trial testimony and repudiated his affidavit of November 27, 1968, declaring it not "a true statement of the facts." Following the hearing, the District Judge denied the motion.

In this court appellant has advanced a number of grounds for reversal, but after full consideration, we affirm his conviction.

## I. Sufficiency of the Indictment

Preliminarily, we deal with appellant's contention that the indictment fails to charge a violation of 18 U.S.C. § 1503.[1]

1. The indictment charges:
 That from on or about the 2nd day of January, 1968, to and including on or about the 9th day of January, 1968, in the State and District of Maryland, Earl Missler did corruptly endeavor to influ-

The defects complained of are that (1) the indictment contains no allegation that the defendant knew that O'Keefe would testify against him at the hijacking trial, and (2) it alleges that Criminal Action Number 27887 was *now* (the date of the indictment for obstruction of justice), rather than *then* (the date of the acts constituting the present offense), pending in the United States District Court for the District of Maryland.

■ We are of the opinion that these are not fatal infirmities. This court, speaking through Judge Rose, in Martin v. United States, 299 F. 287 (4 Cir. 1925), stated the rule followed in this circuit in determining the validity of an indictment:

> The sufficiency of a criminal pleading should be determined by practical, as distinguished from purely technical, considerations. Does it, under all of the circumstances of the case, tell the defendant all that he needs to know for his defense, and does it so specify that with which he is charged that he will be in no danger of being a second time put in jeopardy? If so, it should be held good. * * *

■ Applying this rule, we have no difficulty in sustaining the indictment, for it contains a sufficient statement of the acts said to constitute the offense. Rule 7(c) Fed.R.Crim.P. The forbidden purpose—"preventing said Richard O'Keefe from testifying"—is stated unambiguously. It is inconceivable that the indictment did not put the appellant on notice of the specific nature of the charge against him, or that he was in the slightest degree misled by the use of the word "now" instead of "then." Indeed, we are not prepared to agree with appellant that the indictment failed to state an offense in using the word "now," for an endeavor to obstruct justice could as readily be made in anticipation of an indictment as during its pendency. In any event, no modern criminal court would be warranted in setting aside a conviction on account of such extremely technical deficiencies, which could have had no practical bearing on the defendant's awareness of the accusation or his ability to prepare his defense.

## II. Admissibility of the Testimony of Agents Faulkner and Cobb

In the District Court, Missler's primary contention was that the testimony of Agents Faulkner and Cobb, which the District Judge termed the "cornerstone" of the Government's case, was unconstitutionally obtained and improperly admitted at trial in violation of his rights under the Sixth Amendment to the Constitution. In his reply brief in this court, though not earlier, the appellant advanced the additional claim that his rights under the Fourth Amendment were contravened by the manner in which the agents obtained the information concerning his January 9 conversation with Ferrara, and by their testifying in respect to that conversation. We proceed to a discussion of these two related claims.

### A. Fourth Amendment

Appellant challenges the agents' testimony as the fruit of a violation of the Fourth Amendment's prohibition against

---

ence, obstruct and impede the due administration of justice in the United States District Court for the District of Maryland in that the said Earl Missler: (a) did hire one Vincent Ferrara to cause the murder of or serious injury to one Richard O'Keefe; (b) did pay to Vincent Ferrara on or about January 2, 1968, the sum of $1,500.00 and on or about January 9, 1968, the sum of $500, and on January 9, 1968, did undertake and promise to pay the said Vincent Ferrara an additional $2,000.00, said payments and prom-

ise for the purpose of hiring Ferrara to cause the murder of or serious injury to the said Richard O'Keefe. The aforesaid conduct by the Defendant Missler was with the intention and for the express purpose of preventing said Richard O'Keefe from testifying against the said Earl Missler in Criminal Action Number 27887 *now* pending in the United States District Court for the District of Maryland. (Emphasis added.) T. 18, U.S.C. § 1503.

unreasonable searches and seizures. His argument is that the agents should not have entered Ferrara's home without first obtaining a warrant authorizing them to overhear the incriminating conversation, and for this he relies principally on the Supreme Court's decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In that case, federal agents, proceeding upon probable cause, but without a warrant or the consent of either party to the conversation, placed an electronic device on the roof of a public telephone booth for the purpose of monitoring Katz's end of the conversation. The "bug" did not reach the telephone wires or physically trespass into the booth, but recordings of incriminating statements were made and introduced at trial over objection.

The Supreme Court ruled that

[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a "search and seizure" within the meaning of the Fourth Amendment. 389 U.S. at 353, 88 S.Ct. at 512.

Overruling the "trespass" doctrine announced in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), the Court observed that Katz sought to exclude the "uninvited ear" and noted that "the Fourth Amendment protects people, not places." Under the abandoned doctrine, wiretapping or eavesdropping accomplished without physical trespass of the defendant's premises had been held not prohibited by the Fourth Amendment. In Katz, a violation of constitutional rights was found despite the absence of a technical trespass.

In the instant appeal, appellant's position seems to be that he, like Katz, was "entitled to assume that the words he utter[ed] [would] not be broadcast to the world" and that the agents' conduct "violated the privacy upon which he justifiably relied." 389 U.S. 352, 353, 88 S.Ct. 512. In short, the argument is that Missler's expectation of freedom from governmental intrusion in Ferrara's home is analogous to that of Katz in the public telephone booth. The Government's position, on the other hand, is that Ferrara had the right to invite whomever he pleased into his home and that the appellant therefore was not entitled to assume the privacy of the conversation would be preserved. No right of Missler's protected by the Fourth Amendment is involved in this case according to this argument.

Both parties have cited cases in support of their respective contentions, but none possesses precisely the factors present here. It is not possible to derive from those decisions an all embracing rule. At best, we can only reach for an answer in this case by noting analogies to and distinctions from earlier ones. The process is made difficult by the fact that each time one finds a parallel there also appears a dissimilarity, leaving no basis for exact categorization.

Initially it should be noted that Katz involved electronic eavesdropping which this case does not. Electronic eavesdropping is perhaps more obnoxious. With the use of electronic equipment, as in Katz, the potential for the invasion of privacy is more ominous. Placing a "bug" carries with it the likelihood of intrusion more extensive in time and affecting many more persons than listening with the unaided ear. However, a more fundamental difference is that neither party to the conversation in Katz consented to the overhearing by the Government, whereas here Ferrara invited the agents to his home to listen. Katz, therefore, involved a surreptitious electronic interception of the conversation of two unconsenting parties, and the distinctly offensive nature of this governmental action underlay its condemnation by the Court. In the instant case, Agents Faulkner and Cobb merely accepted Ferrara's invitation to his home,

and they overheard without aid of an electronic instrument.

The Government relies heavily on Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). In that case a government informer named Partin overheard the incriminating statements of petitioner Hoffa while in the latter's hotel suite at his invitation. Partin testified to these at trial, and Hoffa argued that this testimony stemmed from a violation of his Fourth Amendment rights. The argument pressed was that Partin was in a position to overhear the incriminating statements only because he failed to disclose his allegiance to the Government; thus, Hoffa's submission was that his consent to Partin's presence was involuntary in the sense that it was induced by a deceitful non-disclosure.

The Supreme Court disagreed, holding that Partin's testimony had been properly received. The basis of the Court's conclusion was stated in terms pertinent here:

> The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing. * * *

> Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. 385 U.S. at 302, 87 S.Ct. at 413.

The Government's view is that our appellant, like Hoffa, was merely a victim of misplaced confidence, and therefore may not prevail on Fourth Amendment grounds. It contends that, just as Hoffa could not complain of Partin's betrayal, appellant is foreclosed from challenging Ferrara's action in inviting the agents

to his home. The parallel is appealing, though it must be acknowledged that the *Hoffa* holding validated only the testimony of the informer, not that of third parties like Agents Faulkner and Cobb—an issue that did not arise in that case.

The Government also draws attention to Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), in which the appellant attempted to bribe an Internal Revenue Agent named Davis. The latter reported the illegal offer to his superiors, and they instructed him to wear a hidden electronic device when he would next meet with Lopez. This was done, and a recording of their conversation was made and introduced at trial to corroborate Davis' testimony. The Court, upholding the admission of the recording, stated its conclusion as follows:

> We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording. 373 U.S. at 439, 83 S.Ct. at 1388.

An analogy may be drawn between *Lopez* and the present case, notwithstanding the obvious factual difference that here no electronic device was employed. It may well be considered that if a man assumes the risk that the person with whom he holds a conversation will secretly record it for later production at a trial, he no less risks the possibility that the person in whom he confides will act, as Ferrara did, to arrange for live auditors who will later repeat the conversation as first hand, though unrecorded corroborative testimony.[2]

We have considered On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), cited by the prosecution, where an informer named Chin Poy

---

2. In Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), on facts strikingly similar to *Lopez* except that the agents proceeded there under the authority of a warrant, the Court upheld the electronic recording. The

Court had no occasion to consider whether a warrant is necessary in eavesdropping cases in which one of the parties has consented to the overhearing, and it said nothing in contravention of its decision in *Lopez*.

transmitted his conversation with the defendant by use of an electronic device hidden on his person. On Lee was unaware of the recording device or that a government agent was on the receiving end of the transmission. At trial the agent testified as to what he heard, but Chin Poy was not called. In this respect *On Lee* went further than *Lopez*, where the recording was admitted only as corroboration of a government witness. The Court in *On Lee* nevertheless held that the agent's testimony had been constitutionally obtained and properly admitted.

It is noteworthy that while *On Lee* involved a secret *electronic* transmission by a participant in a conversation to agents waiting at a different location, here, by contrast, it was unnecessary for Agents Cobb and Faulkner to use an electronic device. They were within earshot of the conversation by virtue of an invitation from the master of the house.

If *On Lee* is still good law, it goes far to support the Government's position here, but it must be recognized that the authority of that decision has been put in question by the Supreme Court's action in *Katz*, overruling *Olmstead* and *Goldman,* the decisional foundation of *On Lee*.[3]

In Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), a quantity of narcotics was sold by the defendant in his home to an undercover agent who had falsely represented himself to be a narcotics user. The Supreme Court held that the narcotics were constitutionally obtained and therefore admissible in evidence. It squarely rejected the argument that because the defendant's invitation of the agent to his home was induced by deception it could not be deemed a waiver of his Fourth Amendment rights.

*Lewis,* like *Lopez* and *Hoffa,* is an illustration of the general principle that deception may, in some circumstances, be employed in the investigation of criminal activity without running afoul of the Fourth Amendment. To this limited extent, it is relevant to the present inquiry.

The question before us, however, is not the same as in *Lewis*. Lewis' transaction was with an undercover agent and only he testified; there was no offer of testimony of eavesdropping third parties uninvited by the defendant. Here the crux of the controversy is the legitimacy of the presence of such third parties and their testimony as to what they overheard from the unsuspecting appellant's lips.

We see, then, that the Supreme Court has repeatedly sustained the admission of evidence obtained by deception in cases involving government informers. At the same time, the Court has been at pains to emphasize that eavesdropping and its attendant potential for grave intrusion upon the rights of the citizenry must be scrutinized carefully to prevent frittering away of those rights. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). In the present case we have a betrayal by an informer, with the added feature of deception by the surreptitious introduction of eavesdroppers who testified to what they overheard. How are the decisions to be synthesized and applied here?

The cases in which lower federal courts have considered the constitutionality of eavesdropping consented to by one of the parties to the conversation have involved the use of electronic means. The decisions in these cases are in conflict.

3. A majority of the Seventh Circuit, sitting en banc, recently refused to follow *On Lee,* expressing the view that "[t]he overruling of these cases [*Olmstead* and *Goldman*] combined with the reasoning of *Katz* leaves no scope for *On Lee*'s teaching." United States v. White, 405 F.2d 838, 848 (7 Cir.), cert. granted, 394 U.S. 957, 9 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969). The decision of the Supreme Court in *White* next term is likely to clarify the status of *On Lee*.

A number of them have expressed the opinion in convincing fashion that *Katz*, in which neither party to the conversation consented to being overheard by outsiders, should not be distinguished from cases in which one of the parties has agreed to the eavesdrop, and that a warrant should be required in such instances as it was in Katz.[4] Their reasoning is that "[t]he crucial fact in each case is that the respective speakers did not consent to the overhearing of their statements and that the conversations were overheard by third persons uninvited by the speaker." United States v. White, 405 F.2d 838, 843 (7 Cir.), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969).

Other courts, with equal force and eloquence, have expressed the opinion that *Katz's* requirement of a warrant does not apply if either party is cooperating with the law enforcement officials.[5] The rationale underlying this view was well articulated in the dissent of Chief Judge Castle in *White:*

> Unlike *Katz*, the instant case involves not a search and seizure, but a misplaced confidence—not surreptitious eavesdropping, but merely the obtaining of evidence of a conversation in which the Government, through its informer, was a participant. See Lopez v. United States, 373 U.S. 427, 439, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). Had the person on the other end of the telephone line in *Katz* allowed a Government agent to listen in on the conversation, there would have been no constitutional violation. Rathbun v. United States, 355 U.S. 107, 111, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); United States v. Williams, 311 F.2d 721, 725 (7th Cir. 1963), cert. den. 374 U.S. 812, 83 S.Ct. 1703, 10 L.Ed.2d 1035 (1963). Thus, once

the conversation is deprived of its private character through the consent of one of the parties thereto, the Fourth Amendment, not having prohibited the initial exposure, does not prohibit the introduction into evidence of the conversation as transmitted or recorded. * * *

Thus, any expectation, by defendant, of privacy, when the person to whom the defendant is speaking consents to exposure of the conversation is not reasonable and therefore not protected by the Fourth Amendment. 405 F.2d at 850.

This debate is likely to remain unresolved until the Supreme Court furnishes additional guidance. In this regard, we note that certiorari has been granted in *White*. In the case before us, the parties disagree as to the effect of Ferrara's consent. Appellant suggests that we adopt the position taken by the majority in *White,* while the Government urges us to follow the decisions to the contrary.

■ We think, however, that to decide the instant case we need not lay down a broad general rule regarding the effect of a single party's consent without regard to other circumstances. A narrower ground of decision is available. As the parties seem to agree, and we think correctly, *Katz* teaches that Fourth Amendment protection extends only to situations in which the complaining person had a reasonable and legitimate expectation of privacy. It is necessary, therefore, to appraise the reasonableness and legitimacy of Missler's expectation in light of the surrounding circumstances.

■ It is arguable that the present appellant's expectation of privacy was not less reasonable than Katz's, and the question is not free from doubt. How-

---

4. United States v. White, 405 F.2d 838 (7 Cir.), cert. granted, 394 U.S. 957, 89 S. Ct. 1305, 22 L.Ed.2d 559 (1969); United States v. Jones, 292 F.Supp. 1001 (D.D.C.1968).

5. United States v. Kaufer, 406 F.2d 550 (2 Cir. 1969), aff'd on other grounds, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed. 2d 414 (1969); Holt v. United States, 404 F.2d 914 (10 Cir. 1968); Dancy v. United States, 390 F.2d 370 (5 Cir. 1968), a divided court, Judge Fahy dissenting.

ever, we think it of high significance that the appellant spoke, not in his own home, or in a public telephone booth, as Katz did, but in the home of Ferrara. If Ferrara had somehow managed to secrete agents in appellant's home without the latter's knowledge, we would have a very different case. All would agree that in his own home one can reasonably expect to be free from the presence of government listeners uninvited by him. It does not necessarily follow, however, that the Constitution entitles one to indulge in the same expectation when he enters the home of another.[6]

■■ The Supreme Court decisions in *Hoffa* and *Lopez* demonstrate that a person assumes risk of betrayal when he confides in another. The form of the betrayal in these adjudications may differ somewhat from Ferrara's here, but we incline to think the underlying principle is the same. When appellant went to Ferrara's home and there incriminated himself, he took the chance that Ferrara would testify against him, as Partin did against Hoffa; he also risked the possibility that Ferrara was recording the conversation, as Davis had done in *Lopez*. It fairly follows, we think, that he also assumed the risk that Ferrara, in his own home, might choose to secrete witnesses rather than rely on an electronic instrument to witness the incriminating transaction. Ferrara's conduct, to be sure, was a gross violation of the canons of ordinary hospitality. However, the standard we are to apply is not measured in terms of social etiquette due by a host to his guest; the question is one of constitutional dimension. If resort to electronic means to provide corroboration of the informer's testimony is not forbidden, we think it is not unduly stretching

the matter to hold that the informer may invite officers to his own home to witness or overhear a crime which he anticipates will be committed therein, and that the officers may accept his invitation without prior authorization from a magistrate. We are persuaded on balance that no right of privacy protected by the Fourth Amendment was contravened here.

### B. *Sixth Amendment*

■ Appellant relies on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Beatty v. United States, 377 F.2d 181 (5 Cir.), rev'd, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed. 2d 48 (1967), in support of his claim that admission of the agents' testimony concerning his conversation with Ferrara, occurring in the absence of counsel, denied him his Sixth Amendment right to the assistance of counsel. The cited cases establish the general proposition that the right to counsel attaches upon indictment and that incriminating statements made by indicted defendants out of the presence of counsel may not be admitted at trial to prove the charge in the indictment.

■ Clearly, *Massiah* and *Beatty* are without applicability here. In both of those cases, the Government sought to use the defendant's self-incriminating post-indictment statements to prove *the charge in the pending indictment*. Here, by contrast, Missler was under indictment for hijacking, but the trial in which the statements were used was not for that offense. The agents' testimony was received in proof of a distinct and separate offense—obstruction of justice—committed after the hijacking indictment. We find nothing in *Massiah* or

---

6. We are advertent to the fact that in United States v. White, 405 F.2d 838 (7 Cir.), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969), the transmitted conversations "occurred in the defendant's home, automobile, and place of business as well as in the informer's automobile and home." The court did not distinguish between these conversations on the basis of their respec-

tive locations, but it is possible that the court considered the invasion of the privacy of the defendant's home a sufficient ground for reversal, irrespective of the legality of what occurred on premises under the informer's control. If so, the court may have deemed it unnecessary to distinguish between the two sets of conversations.

*Beatty* to support the reading contended for by appellant. The pendency of an indictment for one offense does not immunize a defendant from accountability for statements made after indictment in the commission of another crime, nor does it shield him from testimony concerning them. The cited cases forbid officers of the Government to elicit statements, out of the presence of counsel, from persons under indictment, and then to use those statements to convict them of the charges for which they were under indictment. They do not lay down a rule that persons under indictment may not be overheard and their statements repeated if the statements are of the nature of this appellant's—verbal acts constituting an additional offense, not the one for which they were previously indicted.

An argument similar to appellant's was rejected in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). We referred to that case earlier in discussing appellant's Fourth Amendment claim. The petitioner there was challenging his conviction for jury tampering. The jury in question had not been able to reach a verdict as to petitioner's guilt or innocence on certain Taft-Hartley law charges. As already noted, the conviction under attack was upon the testimony of Partin who had been present during many conversations between the petitioner and the attorneys defending him against the Taft-Hartley charges. One of the contentions pressed by petitioner was that his conviction for jury tampering could not stand because his right to counsel had been violated by the surreptitious invasion of the defense camp by Partin, an agent of the Government.

 The Supreme Court rejected the argument after assuming there had been an intrusion upon the defendant's relationship with his attorneys. The Court pointed out that the intrusion would have been ground for setting aside a conviction, if one had resulted, for the Taft-Hartley offenses, but furnished no basis for reversal of a conviction "on other and separate charges against the same defendant." Similarly, if we assume for the sake of the argument that appellant's right to counsel was infringed, this would be true only as to the then pending hijacking prosecution, and he is not entitled to suppression of evidence bearing upon an entirely new, subsequent offense.

### III. Alleged Violations of the Jencks Act

Appellant next contends that the Government's failure to comply fully with the Jencks Act, 18 U.S.C. § 3500, necessitates reversal of his conviction. He claims that the Act was violated in two respects, and we deal with them separately.

### A. Pre-trial Statements of Witness England

Horace England, one of appellant's co-defendants in the hijacking case, testified for the Government in rebuttal. England had been questioned by the F.B.I. on a number of occasions before appellant's trial, and made statements which were concededly Jencks material. Upon request by defense counsel, the Government, proceeding in good faith, produced what it thought were all of England's pre-trial statements. However, the government attorneys inadvertently overlooked two items and failed to furnish them to appellant. Admitting error in this failure, the prosecution maintains nevertheless that the appellant was not prejudiced thereby and that the conviction should not be set side on that account.

 The requirements of the Jencks Act are intended to provide defendants in federal prosecutions with an opportunity for thorough cross-examination of government witnesses, making the constitutionally guaranteed right of confrontation more meaningful. Violations of the statute are necessarily attended by the danger that this precious right will be impaired. For this reason, and also because it is ordinarily difficult upon review of a cold record to ascertain

the value to the defense of a statement withheld, violation of the Act is excused only in extraordinary circumstances. See Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961); Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). Unless it is perfectly clear that the defense was not prejudiced by the omission, reversal is indicated.

Applying this strict standard, we conclude that the error complained of in this respect was harmless. England testified very briefly as a rebuttal witness for the prosecution. He corroborated the testimony of Ferrara as to appellant's involvement in the hijacking. On cross-examination, the defense attorney vigorously interrogated him as to his numerous interviews with the F.B.I. and exposed the conflicting statements he had made. During this questioning, England reluctantly admitted having lied to the F.B.I. on at least seven occasions. The effectiveness of defense counsel's cross-examination is highly relevant in determining whether there was prejudice by reason of the Government's nondisclosure, and here there can be no doubt that England's credibility was very seriously impeached. Furthermore, the statements withheld differed from the statements furnished only in minor details. It would be sheer speculation to suggest that these differences, if known to defense counsel, would have resulted in material improvement upon the shattering cross-examination he was able to achieve without knowledge or use of the statements in question. We therefore conclude that the Government's failure to furnish them does not warrant reversal.

### B. *Destruction of Notes by Agents Faulkner and Cobb*

As Agents Faulkner and Cobb, unobserved, listened to the conversation between appellant and Ferrara at the latter's home, they made sketchy handwritten notes. These notes contained an abbreviated version of the conversation.

Returning to the F.B.I. offices, the agents immediately prepared a formal report of the occurrences at Ferrara's residence. In the preparation of this report, they relied on their memories and on the notes. After satisfying themselves that their report was a full and accurate statement of the day's events, they destroyed the notes. The only explanation offered was that destruction of notes of this nature was a "common practice."

Appellant contends that these notes were Jencks material which the Government was under an obligation to produce. He claims that without them he could not effectively cross-examine the agents and suggests that it is impossible for the court to be certain that the agents did not, in the preparation of the formal report, improve upon their notes. We do not join in this insinuation, but we do agree that the F.B.I.'s practice is subject to criticism and introduces opportunity for the assertion of doubt. Retention of the notes would foreclose many attempts to impeach F.B.I. agents' reports. Notwithstanding this, we think appellant is not entitled to relief because the notes in question do not fall within the statute.

In United States v. Johnson, 337 F.2d 180 (4 Cir. 1964), aff'd, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), this court was called upon to consider the effect of the destruction of F.B.I. notes. The notes destroyed there had been made by F.B.I. agents during interviews of a *defendant* and a *defense* witness. At trial the testimony of the agent and the parties interviewed as to the statements made during the interviews was sharply conflicting. The appellant there contended that destruction of the notes violated the Jencks Act. We rejected the contention on the ground that statements by other than government witnesses may not qualify as Jencks material, but we observed the ill-advised nature of the F.B.I.'s practice:

Each time the problem has arisen the FBI has claimed that the notes were destroyed as part of FBI routine.

This is really not a satisfactory answer. Where the agent testifies to matter he claims not to be in the notes and the defendant insists on a different version, an issue arises which may not be satisfactorily resolved in the absence of the original notes. If the notes were available, they might confirm or refute one version or the other. One of the purposes of both the Jencks decision and the Jencks Act is to afford the defense an opportunity to impeach witnesses. Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); United States v. Wenzel, 311 F.2d 164, 171 (4th Cir. 1962). The destruction of interview notes does not advance this purpose. Of course, a district court may find as a fact that the notes were not a substantially verbatim record, or that they were accurately copied into a report and then destroyed in good faith, but the necessity for inquiries along this line can be avoided by the preservation of notes until after the trial. Eliminating uncertainty may serve the interest of the Government no less than the defendant. 337 F.2d at 201–202.

In the instant case, the notes recorded a conversation between a government witness and appellant. These notes therefore could qualify as Jencks material if they satisfy the requirements set out in 18 U.S.C. § 3500(e) (2). That section provides:

> (e) The term "statement," * * * in relation to any witness called by the United States, means—
>
> * * * * * *
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a *substantially verbatim recital of an oral statement* made by said witness *to an agent of the Government* and recorded contemporaneously with the making of such oral statement. (Emphasis added.)

Agent Cobb testified that the notes did not contain a verbatim statement of the conversation between Ferrara and appellant, and nothing in the record suggests the contrary. A serious question arises therefore as to whether the notes were a "substantially verbatim recital of an oral statement" made by Ferrara. Furthermore, the cited provision requires that a Jencks statement be made "to an agent of the Government." Although Ferrara was aware that Agents Faulkner and Cobb were listening, it is fair to say that his conversation was directed to the appellant, who of course is not a government agent. For these reasons, we conclude that the notes destroyed were not subject to demand under the Act.

## IV. *The Failure to Sequester Agent Cobb*

At the beginning of trial, counsel for appellant moved that all witnesses be excluded from the courtroom until called to testify. The Government opposed the motion with respect to Agent Cobb on the ground that it was customary practice for the agent in charge of the investigation to remain at the counsel table to assist the prosecuting attorneys in presenting their case. The District Court granted the appellant's motion as to every witness except Agent Cobb.

The Government then began putting on its case. Ferrara testified first, followed by Agent Faulkner, not by Cobb who was already in the courtroom. Appellant contends that the District Court abused its discretion in permitting Faulkner to testify in Cobb's presence before the latter testified. He suggests that the procedure followed deprived him of a fair trial because it eliminated the possibility of serious discrepancies in the "cornerstone" testimony of the two agents.

This court has repeatedly rejected the contention now urged by appellant. United States v. Adams, 376 F.2d 824 (4 Cir. 1967); Schoppel v. United States, 270 F.2d 413 (4 Cir. 1959); Laird v. United States, 252 F.2d 121 (4 Cir.

**1306**

1958.) Only if prejudice were shown would the District Court's action be set aside. Here the appellant suggests only the possibility of impropriety on Agent Cobb's part. Under the circumstances, we see no reason to depart from our earlier holdings.

### V. *Sufficiency of the Evidence*

■ Missler's final assignment of error is that the Government's evidence, even when viewed in the light most favorable to the prosecution, did not prove commission of the offense.[7] The contention is advanced that no "endeavor" within the meaning of the statute was proven because Ferrara made no attempt on O'Keefe's life and had no intention of doing so. Thus, it is argued, a "solicitation" or "preparation for an endeavor" was proven, but not an "endeavor."

The Supreme Court's decisions in United States v. Russell, 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed. 553 (1921), and Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), foreclose this argument. In both cases the Court rejected the contention that the defendant's improper conduct must be successful in achieving the forbidden objective in order to fall within the statute's proscription. There can be no question that a person "endeavors" to obstruct justice when he arranges to have a prospective government witness murdered.

For the reasons stated, we conclude that appellant's trial was free of prejudicial error and the judgment of the District Court is accordingly

Affirmed.

---

7. The statute, 18 U.S.C. § 1503, provides in pertinent part:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, *endeavors* to influence, intimidate, or impede any witness, in any court of the United States * * * in the discharge of his duty * * * or corruptly or by threats or force * * * influences, obstructs or impedes, or *endeavors* to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 769. (Emphasis added.)