**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard BADOLATO, Jan C. Sabo and Frank J. Perate,**
**Defendants-Appellants.**

**No. 81–6100.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 1, 1983.

Rehearings and Rehearing En Banc
Denied Sept. 16, 1983.

Alan E. Weinstein, Miami Beach, Fla., for defendant-appellant Frank J. Perate.

Ronald A. Dion, North Miami Beach, Fla., for defendant-appellant Richard Badolato and Jan C. Sabo.

Stanley Marcus, U.S. Atty., Michael W. Burnbaum, James G. McAdams, III, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, AN-DERSON, Circuit Judge, and GOLD-BERG *, Senior Circuit Judge.

GODBOLD, Chief Judge:

Appellants Frank Perate and Jon Sabo were convicted of conspiracy to possess cocaine (Count I) and possession with intent to distribute (Count II). Appellant Richard Badolato was convicted on only the conspiracy count. Neil Perate, Frank Perate's cousin, was granted a judgment of acquittal on Count II at the end of the government's case, and the jury acquitted him on Count I. The indictment against Davis Greth, charging him under both counts, was dismissed by the government at trial immediately before the jury was sworn.

Government agents posing as narcotics sellers met with Badolato in early February

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-tion.

1981 at an apartment used by the agents and discussed possible purchase by Badolato of several thousand pounds of marijuana. In early March agents talked with Badolato, who asked whether they had cocaine for sale; when an agent answered affirmatively Badolato indicated he would send his partner "Frank" to deal with them. "Frank" was Frank Perate, who talked with an agent, confirmed that he wished to purchase cocaine, and arranged a meeting at the agents' same apartment. Frank came to the apartment accompanied by Sabo. Frank indicated that Badolato had recommended the agent as having high quality cocaine. After further discussion an agent brought cocaine, and Frank and Sabo examined it, discussed its quality, and snorted some of it. After negotiations Frank and Sabo left and returned with a briefcase and suitcase containing about $225,000. Both men were carrying male purses. An agent brought the full quantity of cocaine to the apartment, cocaine and money were exchanged, and in addition the agents delivered other cocaine on consignment to be sold by Frank and Sabo. Frank and Sabo, assisted by the agents, put the cocaine into the suitcase. Frank told the agents that the cocaine was to be taken to Pennsylvania for resale. Frank wrote his telephone numbers on a slip of paper which he gave to an agent. He told the agent that he would notify him when the consigned cocaine had been sold.

Frank and Sabo left the apartment and went to their car nearby, accompanied by agent Healey, who watched as Sabo put the cocaine-filled suitcase, the briefcase, and his purse in the trunk, which was then locked. Agent Hahn remained in the apartment but saw these activities through a window. Frank and Sabo entered the vehicle and drove away with Sabo at the wheel. Another agent, Raynor, who was visually surveilling the apartment, also observed these actions of Frank and Sabo.

By prearrangement a DEA car and a marked local police car were located just out of sight of the apartment. The defendants' car went a short distance, turned, and traveled about 30 more yards. The two

officers' cars moved to block the road. Defendants stopped their car, went into reverse, stopped again, and officers from the blocking cars came to defendants' car, had them get out, and arrested them. Without a search warrant, officers opened the trunk, opened the suitcase, and of course found the cocaine.

That night Badolato called one of the agents, who returned the call. Badolato asked if the deal had been completed and expressed concern that he had not heard from Frank. Badolato indicated that the cocaine purchased in the deal was his (Badolato's). The two discussed the possibility of additional cocaine deals. Two hours later Badolato and the agent talked again. Badolato was upset that Frank and Sabo were missing and expressed fear they might have been "ripped off." He described the "corporation" that he and his associates had and the modus operandi of the group. Badolato asked the agent to call Frank's girlfriend and the "driver" (described as "Neil") to discuss what to do. The agent called Neil, who turned out to be Neil Perate. Neil indicated that he was to have been involved in transporting the cocaine and that he too was concerned about Frank. A meeting was arranged, and agents met Neil and David Greth. Neil expressed concern about Frank and Sabo and indicated that he was waiting to drive the cocaine up north. He and Greth were arrested.

*(1) Search of the suitcase*

The search occurred before the decision in *U.S. v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), holding that when officers have legitimately stopped an automobile and have probable cause to believe that it is carrying concealed contraband they may open and search a closed suitcase that is in the vehicle. The Second and Fourth Circuits have held that *Ross* applies retroactively. *U.S. v. Burns,* 684 F.2d 1066, 1074 (2d Cir.1982); *U.S. v. Martin,* 690 F.2d 416, 421 n. 4 (4th Cir.1982). *See also U.S. v. Coletta,* 682 F.2d 820, 825–26 (9th Cir.1982); *U.S. v. Floyd,* 681 F.2d 265, 266 (5th Cir. 1982); *U.S. v. Jones,* 687 F.2d 1265, 1266 n.

1 (8th Cir.1982). We reserve for another day consideration of the retroactivity issue with regard to the suitcase into which, only minutes before and with the assistance of officers, Frank and Sabo had packed cocaine.

■■■ The officers engaged in this carefully planned and integrated operation had probable cause to stop the vehicle and to believe that contraband was concealed within it. Healey and another agent saw or assisted in placing the cocaine in the suitcase. Under the prearranged plan, Healey's departure from the apartment with Frank and Sabo signaled other officers that the two defendants had the cocaine in their possession. Healey was present when Frank and Sabo put the suitcase in the trunk; at least two other agents also observed this. Defendants' car pulled off, and by prearranged signal the two officers' cars moved to block the roadway. Defendants' car stopped and agents converged on the spot. Rayner, who had seen Healey's prearranged signal conveying that defendants had the cocaine, and had seen the suitcase and briefcase put in the trunk, was 25 feet away from the car when it finally halted. He went to the car and identified the suitcase, as did Healey who came immediately to the car. The right of the officers to stop the car, and probable cause to suspect that there was contraband concealed in the car, are unmistakably clear under these circumstances. With respect to the suitcase itself, neither Frank nor Sabo can claim a privacy interest in a closed suitcase into which only minutes before, in the presence of participating officers and with the assistance of some of them, they had packed cocaine.[1]

### (2) Extrinsic activity evidence (Badolato only)

The government introduced a 42-minute video tape of the February meeting between agents and Badolato, which depicted conversations concerning growing and marketing marijuana, the value of marijuana for sale, and the sale and purchase of marijuana in large quantities. The meeting ended with Badolato's indicating that he would be in touch if he were interested in negotiating a deal.

■■■ Badolato asserts that this evidence was not admissible as extrinsic offense evidence under Fed.R.Evid. 404(b), because there was no agreement and thus no conspiracy, thus no criminal offense, which he says is a prerequisite to admissibility. He also argues that the evidence was unduly prejudicial under Rule 403 and only excised portions should have been shown, or live testimony used instead, and that the court should have given limiting instructions. The short answer to all this is that beginning with opening statements Badolato claimed to have been entrapped by the government. With entrapment in the case the government was required to prove predisposition, and the tape was admissible for this purpose. The court instructed the jury on entrapment, including an instruction that the video tape could be considered on that issue.

### (3) Post-arrest statements (Frank and Sabo)

Agents recorded their conversations with Badolato, Neil Perate and Greth that occurred in the hours after Frank and Sabo were arrested and the cocaine seized. Information from these conversations was introduced, with Frank and Sabo objecting on hearsay grounds. Alternatively they moved for a severance based on *Bruton v. U.S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which was denied.

■■■ The statements of Badolato were not inadmissible against Frank and Sabo on

---

1. This opinion was prepared before the Supreme Court decision in *Illinois v. Andreas*, —— U.S. ——, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). In that case the Supreme Court holds that a warrant was not required to reopen a sealed container in which contraband drugs had been discovered in an earlier lawful search, when the container was seized by the police after it had been delivered under police supervision, because once government agents lawfully opened the container and identified its contents as illegal there was no protected privacy interest in the resealed container. Our conclusion fully accords with this decision.

the ground that the conspiracy had terminated with the arrest of Frank and Sabo and seizure of the cocaine. The active participation of Frank and Sabo had terminated, but they remain responsible for acts committed in furtherance of the conspiracy by co-conspirator Badolato, who was still at large. *U.S. v. Killian,* 639 F.2d 206 (5th Cir.1981).

With respect to the statements of Badolato, Neil Perate and Greth, we can cut through the intricacies of the *Bruton* issue. Assuming *Bruton* applies to any statement by Badolato, Neil Perate or Sabo, with respect to Frank and Sabo the evidence was so overwhelming that admission of any such statement, if error, was error harmless beyond reasonable doubt. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). We need not restate the facts. Frank and Sabo were caught red-handed, with the contraband in their possession, implementing a deal that Badolato had set up.

### (4) Massiah violation (Badolato)

All of the relevant conversations and transactions between government agents and Badolato occurred after an indictment had been returned in a Georgia federal court charging Badolato with a drug conspiracy. The agents knew of the pending indictment. Badolato asserts that the agents' conversations with him violated *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *Massiah* has no application where, after judicial proceedings have been initiated and the right to counsel is triggered, the defendant makes incriminating statements to officers in the process of committing a separate criminal offense. *Hoffa v. U.S.,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *U.S. v. Missler,* 414 F.2d 1293, 1302–03 (4th Cir.1969); *Grieco v. Meachum,* 533 F.2d 713, 717–18 (1st Cir. 1976). There has been no showing here that the transactions between Badolato and the agents were part of the same offense charged in the Georgia indictment.

### (5) Coerced verdict (all defendants)

All defendants contend that under the totality of circumstances test the jury's verdict was coerced. *Jenkins v. U.S.,* 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965); *U.S. v. Fossler,* 597 F.2d 478, 485 (5th Cir. 1979). The jury began deliberations at 1:25 p.m. Just over five hours later a note was sent to the judge stating that the jury was at an impasse on all counts as to all defendants. Defendants' motion for a mistrial was denied, and the court gave a modified *Allen* charge. *Allen v. U.S.,* 164 U.S., 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896). The court told the jury it could deliberate as long as it wished, or if it preferred it could resume deliberations the next morning.

At 9:23 p.m., two and one half hours later, the jury sent a note that it had reached a verdict. A verdict was announced that Perate and Sabo were guilty of counts I and II, Badolato guilty of count I and not guilty of count II, and Perate not guilty of count IV, a firearms possession charge concerning a weapon found in the car. A poll was requested, and juror No. 1 answered "no" to the question whether it was "his verdict." The court stopped the poll and, at 9:31 p.m., instructed the jury as follows:

> [T]he court instructs the jury to return to the juryroom with the verdicts, and you are to recommence your deliberations and reapproach it as if from the beginning and consider the verdicts that you would arrive at in this case.
>
> Go back and start all over in terms of your verdicts.

Motion for mistrial was made and denied.

Five minutes later the jurors sent this note:

> Your Honor, the poll question was misunderstood. We have reached a unanimous verdict.

The jury returned to the courtroom and published the same verdict as a few minutes earlier. A poll again was requested, and all jurors answered affirmatively. The jury retired. Defense counsel then stated to the court that juror No. 5 had been hesitant

with her answer and deliberated before responding, that she spoke in a barely audible voice, and that the juror behind her had whispered something to her and had kicked or nudged her chair. Counsel asked for a poll of the jurors, each to be polled out of the presence of the others. The court granted this for jurors Nos. 1 and 5. Juror No. 1 responded affirmatively to the question whether the verdict was his true verdict. Juror No. 5 answered negatively. At the request of counsel No. 5 was separated from the other jurors by being taken to the judge's chambers. After various motions were made and argued the jury was brought back in, and No. 5 joined the others.

The court then gave this instruction:

Ladies and gentlemen of the jury, in accordance with a right that is perfectly proper and perfectly assertable, and commendably assertable, one of the jurors, who was independently inquired of indicated that the verdicts as read were not, in fact, a true verdict as to that juror.

Under those circumstances, here is what the Court is going to do, and listen carefully: the Court is going to direct the Clerk to return all verdict forms to you, ask you to go back into the juryroom and commence your deliberations again to seek to search unanimous verdicts as to each defendant on every count.

But I will tell you that if you cannot reach a unanimous verdict as to each defendant on each count, return your verdicts on those counts and those defendants on which you can reach a unanimous verdict and simply have your foreperson, if there are any counts as to any defendant, scratch through the verdict form what is not unanimously agreed to and initial it and so, therefore, you can bring back in verdicts that you do unanimously agree upon as to a defendant on a count.

If you cannot agree as to a count or a defendant, then don't bring it back in. Just bring the verdict form back reflecting no verdict as to that particular count or that particular defendant.

Approximately 15 minutes later the jury sent another note saying that it had reached a unanimous verdict and came back and announced again the same verdict that had been announced twice previously. A poll was requested, and all jurors answered affirmatively. Defense counsel stated to the court that though No. 1 had said "yes" he had been shaking his head "no." The court on its own motion brought Nos. 1 and 5 back in again separately, and each responded affirmatively that the verdict as read was true. Defendants asked for individual poll of Nos. 1 and 5, they were questioned individually, and both affirmed their agreement with the verdict.

The defendants do not question the correctness of the judge's actions through the events of the *Allen* charge, the subsequent deliberations, the announcement of a verdict followed by the disclaimer by juror No. 1, and the instruction to "go back and start all over." They contend, however, that the series of events that began when the jury came back into the courtroom with its second verdict, and was polled, required the court to grant a mistrial. They assert these circumstances:

—previously it had been revealed that one or two jurors were anxious to leave on a family vacation and had time constraints.

—defense counsel said that juror No. 5 was emotionally distraught and another juror had whispered to her and kicked her chair when she hesitated.

—juror No. 5 was isolated from other jurors for a time while she was being questioned individually about her agreement with the verdict.

—after juror No. 5, outside the presence of the others, had expressed her disagreement, and the jury had been reassembled and sent back to deliberate a fourth time, after 10:00 p.m., only 13 minutes was required to reach a verdict.

—the post-trial affidavits of Frank Perate and Sabo show that jurors were coerced.

▪ Under "the surrounding circumstances" test, the verdict was not coercive.

Indeed, the trial judge used great care and caution to be certain that any juror's lack of agreement with the verdict could be stated and given effect.[2] Assuming *arguendo* that the interplay between juror No. 5 and the juror behind her was inappropriate, the court separated juror No. 5 and established from questioning her that she disagreed with the verdict. He then sent the jury out again to reconsider.

At no time did the judge tell the jury, or imply to the jury, that it was required to reach a verdict, that it was required to reach a verdict that night, or that a juror who had stated disagreement was required or expected to change his or her view. This was an unusual situation, and what the court did was to carefully bring to the surface and record the positions of the dissenting jurors and then, without criticism or coercive words, send the jury back out to consider further. That the jury twice returned with unanimous verdicts after a juror had indicated previous disagreement, is not itself proof of impropriety. Changes of positions by jurors as a consequence of deliberations are an appropriate feature of the deliberative process.

### (6) Motion to interview jurors

Defendants filed a motion to interview jurors, alleging that, after the verdict was returned and the jury dispersed, two of the defendants were approached in the vicinity of the courthouse by jurors Nos. 1 and 5 who told them that they and two other jurors wanted to return not guilty verdicts and that the unanimous verdicts were reached because jurors refused to recess until the next morning, two jurors wanted to leave for vacations, two jurors almost got in a fist fight, one slept through the deliberations, and that the four jurors referred to were brow-beaten into submission, juror No. 5 reduced to tears, and, finally, that the jurors believed under the judge's instructions that they were required to reach a verdict.

2. The trial judge repeatedly told Nos. 1 and 5 that the court was not trying to cause him/her undue concern or problem, that each had a right to his/her independent view, and that

Fed.R.Evid. 606(b) forbids a juror to testify, or the court to receive his affidavit, on matters occurring during the course of deliberations, except that a juror may testify with respect to whether extraneous prejudicial information has been brought to the jury's attention or outside influence brought to bear. None of the matters said to have been described by the jurors refers to extraneous information or outside influence on the jury, except that the statement concerning the judge's instructions, perhaps arguably, can be considered to relate to extrinsic circumstances as part of the overall circumstances described in section (5), above. But we have already held that those circumstances were not coercive.

### (7) Motion for judgment of acquittal (Sabo)

Sabo's argument that he was entitled to a judgment of acquittal on the possession charge because there was insufficient evidence of his dominion and control over the cocaine is frivolous.

The judgments of convictions are AFFIRMED.

he/she need only answer affirmatively or negatively to the single question (whether the verdict was his/her true verdict).