**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Kenneth Kermit HAYLES et al.,
Defendants-Appellants.**

**No. 72–1901.**

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1973.

Phil Burleson, Dallas, Tex., for all defendants-appellants.

Eldon B. Mahon, U. S. Atty., W. E. Smith, Asst. U. S. Atty., Ft. Worth, Tex., for plaintiff-appellee.

Before GEWIN, THORNBERRY and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

After a joint trial before a jury appellants Hayles, Mullins, Bullock and Waggoner were convicted of violating 18 U. S.C. §§ 371 (conspiracy), 471 (making counterfeit money with intent to defraud), 472 (possessing counterfeit money with intent to defraud), and 473 (transfer of counterfeit money with intent to defraud). Appellants challenge their convictions contending that the trial court committed the following errors: (1) in admitting into evidence tapes of certain conversations in which two of the appellants made incriminating statements; (2) in admitting evidence seized by the government while executing a warrant not based on probable cause; (3) in improperly limiting the scope of a pretrial hearing to determine whether certain in-court identifications might have been irreparably tainted by the prior use of impermissibly suggestive photographic spreads; in admitting evidence obtained by an alleged illegal entrapment; and (5) that the evidence was insufficient to support a finding that appellant Hayles knew the bill he passed in Mabank, Texas was counterfeit. A careful review of the record and the applicable law convinces us that these convictions must be affirmed.

Before considering the questions raised by appellants, a brief summary of the evidence presented at trial will be helpful. In May 1971 appellants Kenneth Hayles and Thomas Bullock purchased a printing press and other printing supplies. Later that month Hayles told David Smith, a pilot who as a young boy knew Hayles well when Hayles was working as a respected police officer and who recently had loaned Hayles a considerable sum of money, that he was planning to make some counterfeit money for wholesale and that he would pay Smith back from the proceeds. Smith attended several meetings at which he, Hayles, Bullock, and appellant Thomas Waggoner discussed how to make counterfeit money, where it would be best to print it, and generally the details of forming and conducting a counterfeiting operation.

In June Hayles, Bullock and Waggoner drove to Louisiana to pass counterfeit $20 bills; they traveled in a gold 1971 Pontiac. On June 13, 1971 and again on June 15, 1971 employees at several different country stores in the Oak Grove, Louisiana area reported the passing of counterfeit twenties at their respective stores by three men driving a gold 1971 Pontiac. While investigating these reports, Deputy Sheriff Smith arrived at another Oak Grove store just as Waggoner was passing a counterfeit bill. Deputy Smith arrested Bullock and Waggoner, but Hayles managed to escape on foot carrying a brown paper sack. Some of the employees who had reported the receipt of bogus money were later able to identify either Bullock or Waggoner as the man who had passed it in their store.

On June 20, 1971 in a conversation with David Smith, Hayles recounted the Louisiana episode. He said that when the deputy appeared he grabbed a sack of money, jumped out of the car, and ran down an alley. He hid the money under an oil drum and concealed himself under an old steam cleaning engine; when the coast cleared, he made his escape. The sack of counterfeit bills which Hayles had hidden under the oil drum was found the next day by an Oak Grove resident.

On June 25 Hayles hid a sack of counterfeit bills at Smith's house and gave Smith some loose bills to pass. On June 30 Smith was arrested while passing bogus bills at a Dallas shopping center; he agreed to cooperate with the government and from this date became an informer.

Meanwhile during June appellant James Mullins began to supply Randall Cook with counterfeit twenties; Mullins introduced Cook to Bullock and made it clear that they had an unending supply of counterfeit money. In August Cook obtained $20,000 in counterfeit bills from Mullins which he tried to sell in a single transaction to Secret Service agent Strand. Upon being arrested, Cook decided to cooperate with the government, and he stated that Bullock and Mullins were the brains behind the operation.

The denouement of this counterfeiting story occurred in October when Hayles was stopped after passing a counterfeit twenty in a store near Mabank, Texas. Although Hayles denied knowing the bill was counterfeit, he was arrested when a check of his license plate numbers revealed them to be fictitious.

Of the several contentions made by appellants, only one requires anything more than cursory discussion, the claim that the trial court erred in admitting into evidence tapes of conversations in which Hayles and Bullock made incriminating statements to government informer Smith. These conversations took place on July 16 and 17, 1971. Bullock had been arrested in Oak Grove on June 15, and shortly thereafter the govern-

ment filed charges against him in Louisiana. Although Hayles managed to escape when Bullock was arrested, the Secret Service must have known about him because counterfeiting charges were filed against Bullock and him in the Eastern District of Texas at approximately the same time. Both Hayles and Bullock retained counsel to help them defend against these charges. Thus by June 30, the date of Smith's arrest and decision to cooperate with the government, Hayles and Bullock along with other persons had become the focus of a counterfeiting investigation, and criminal charges had been filed against them with respect to some of the acts eventually included in the conspiracy count of the indictment in this case. But no charges had been filed in the Northern District of Texas, nor were there any indictments outstanding in any United States District Court at this time. The indictment in this case was not returned until December 13, 1971, and in it Hayles and Bullock were charged not only with conspiracy but with substantive crimes which allegedly occurred long after the tapes in question were made.

After his arrest, Smith advised Hayles and Bullock of his predicament. On several occasions prior to July 16 Hayles called him to discuss his arrest and to offer him financial aid so that necessary legal fees could be paid. On July 16 Smith received a phone call from Bullock. He said he could not talk at that time but agreed to call back when convenient. Later that day he went to a local Secret Service office and returned the call. Without telling Bullock, he allowed government agents to record the ensuing conversation with a monitoring device. In this conversation Smith asked Bullock to have Hayles contact him as soon as possible. That night he received two telephone calls from Hayles, both of which he permitted the government to tape. In one of these conversations, Smith arranged to meet Hayles later that evening at a motel; the conversation at this meeting was

recorded by means of a small radio transmitter taped to Smith's chest.

During these conversations Smith asked Bullock and Hayles to supply him with some more counterfeit money ("funny stuff") and to a rather limited extent discussed counterfeiting activities. Although both Bullock and Hayles were noticeably reluctant to discuss their counterfeiting operations and never offered to supply Smith with more bogus money, they did make statements from which it could be inferred that they were associated with counterfeiters and had access to counterfeit bills. While Smith did not inform Hayles or Bullock that the conversations were being monitored, during some of their conversations there were comments to the effect that perhaps Smith's phone was "bugged." At trial the tapes of the conversation were played in the presence of the jury. Appellants argue that admission of the tapes into evidence violated their Fifth Amendment privilege against self-incrimination and their Sixth Amendment right to counsel.

Ordinarily Fifth Amendment questions of the kind raised by appellants are cast in terms of a *Miranda* violation, i. e. a government failure to give the prescribed warnings before conducting a custodial interrogation. But *Miranda* is inapplicable to the facts of this case because Hayles and Bullock were certainly not in custody when their conversations with Smith were taped. Instead appellants rely on the pre-*Miranda* case of Massiah v. United States.[1] In that case after an indictment had been returned charging Massiah and another man named Colson with various narcotics offenses, Colson decided to cooperate with the government. He permitted a government agent to conceal a radio transmitter in his car, and while sitting in the car, he engaged Massiah in a conversation about the crime for which they had been indicted so that the agent could overhear Massiah making incriminating statements. The Supreme Court held that the deliberate, surreptitious elicitation of incriminating statements from Massiah by a government agent after he had been indicted, had retained an attorney, had been arraigned on the charges and had pled not guilty violated his Sixth Amendment right to counsel. The Court went on to say:

> "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial."[2]

With the advent of *Miranda* and the accompanying shift away from the Sixth to the Fifth Amendment as the constitutional provision guaranteeing defendants protection from being made the deluded instruments of their own convictions,[3] *Massiah* lost some of its significance. Yet in one important respect it retains its vitality and stands as a supplement to *Miranda; Massiah* teaches that although the government may properly continue to gather evidence against a defendant after he has been indicted, it may not nullify the protection *Miranda* affords a defendant by using trickery to extract incriminating statements from him that otherwise could not be obtained without first giving him the required warnings. Today *Massiah* simply means that after indictment and counsel has been retained the Fifth Amendment prevents law enforcement authorities from deliberately eliciting incriminating statements from a defendant by the surreptitious methods used in that case. Of course nothing

---

1. 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

2. *Id.* at 207, 84 S.Ct. at 1203.

3. Johnson v. New Jersey, 384 U.S. 719, 730, 88 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

said in *Massiah, Miranda,* or any other case that has been brought to our attention renders inadmissible spontaneous or voluntary statements made by the defendant in the presence of government agents.[4]

■ It is likewise true that statements made by a defendant as to the commission of a distinct and separate offense from the offense charged in a pending indictment are admissible against him upon trial for such separate and distinct offense. "The pendency of an indictment for one offense does not immunize a defendant from accountability for statements made after indictment in the commission of another crime, nor does it shield him from testimony concerning them."[5] Indeed the substantive offenses charged in the indictment against the appellants in this case had not been committed when the tapes were made.

Applying *Massiah* to the facts of the case at bar, we have serious doubts as to whether the tapes in question were constitutionally admissible at the trial of Hayles and Bullock. To some extent Smith prompted the conversations with Hayles and Bullock and asked questions apparently intended to elicit incriminating responses which could be used against them at trial. In some respects it can be said that Smith became the instrument by which the government was enabled to interrogate Hayles and Bullock without their knowing it. Although the indictment under which appellants were finally brought to trial had not yet been returned when the conversations with Smith were taped, charges had

been filed in two other districts with respect to some of the same overt acts for which they were eventually tried under the conspiracy count of the indictment in this case. The incriminating statements obtained with the help of informer Smith were intended to be used in the prosecution of these charges. Hayles and Bullock had undisputedly become the focus of the counterfeiting investigation, and both had retained counsel to help prepare their defense with respect to the complaints pending against them in the other districts. At this point in its investigation of appellants' activities the government may well have been precluded by the Fifth Amendment from surreptitiously extracting incriminating statements from them.

But it is only fair to mention some facts which distinguish *Massiah* from this case. Massiah was induced to incriminate himself after a formal indictment had been obtained, after he had retained counsel to defend against that indictment, and after he had been arraigned; and entered a plea of not guilty. When the tapes were made in this case, no indictment was pending against appellants in the Northern District of Texas or in any other United States District Court. Formal, adversarial criminal proceedings had not yet been initiated. In a sense the tapes were gathered as part of a continuing government effort to get the facts which would permit suspicion to crystallize into the certainty with which indictments are sought.[6] Moreover, the relationship between Smith, Hayles and Bullock was rather unusual. When Smith

---

4. Hoffa v. United States, 385 U.S. 293, 303–304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). See also United States v. Knoll, 379 F.2d 427 (5th Cir. 1967); United States v. Garcia, 377 F.2d 321 (2d Cir. 1967); and Hurst v. United States, 370 F.2d 161 (5th Cir. 1967), cert. denied 387 U.S. 910, 87 S.Ct. 1687, 18 L.Ed.2d 628.

5. United States v. Missler, 414 F.2d 1293, 1303 (4th Cir. 1969).

6. *See* Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, 417 (1972) in which the Supreme Court emphasized that it was not until the government has completed its investigation and formally committed itself to prosecute that one's Sixth Amendment right to counsel attaches. The right does not come into play until after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

was a boy 10 or 12 years old he had known Hayles and Bullock as respected police officers. Smith was pursued by them from the very beginning, and Hayles was able to borrow several thousand dollars from Smith before the counterfeit operation was disclosed to him. Numerous calls were made by Hayles to Smith prior to and during the formative stage of the conspiracy. After Smith was arrested, Hayles and Bullock, particularly Hayles, continued to communicate with Smith by telephone. In these circumstances we hesitate to say that there is present in this case the deliberate, surreptitious elicitation of incriminating statements by government agents which was denounced in *Massiah*. However, we do not hesitate to record our disapproval of the practices employed by the government in obtaining the tapes.

But in spite of possible error in the admission of the tapes into evidence against appellants Hayles and Bullock, we do not reverse the judgment rendered below. The case against appellants was airtight. From the beginning the evidence portrayed Hayles and Bullock as the leaders of the counterfeiting conspiracy, and there was more than ample direct evidence that they committed the substantive offenses for which they were charged. The admission of the tapes, which contained only inferentially incriminating statements if anything, could have had only a de minimis bearing on the question of guilt or innocence when viewed in light of the overwhelming evidence of guilt from other sources. Conceding arguendo that constitutional error was committed in admitting the tapes into evidence, we hold that such admission was harmless beyond a reasonable doubt.[7]

Appellants' other contentions are patently frivolous. The search warrant to which appellants object was issued upon an affidavit setting out ample information to sustain an independent determination that probable cause existed; although the information contained in the affidavit was not based on the personal knowledge of the affiant, it was based on the personal observations of a fellow law enforcement official engaged in the same investigation and as such could be presumed reliable.[8] The trial judge followed to the letter the procedures we outlined in United States v. Sutherland [9] for determining before trial whether photographic spreads used in a particular case are impermissibly suggestive, and there is no indication in the record that he erred in ruling that the photographic spreads used in this case were not impermissibly suggestive. The defense of entrapment is normally one of fact for the jury to decide,[10] and under the facts of this case it was proper to submit the question of entrapment to the jury. Finally the evidence presented in this case was sufficient to support the jury's determination that Hayles knew the bill he passed in Mabank was counterfeit. In deciding the question of guilty knowledge the jury had every right to scrutinize all of Hayles' conduct, not just his actions at the time of the Mabank incident. The record is replete with evidence that Hayles was one of the leaders of this

7. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We also take note of the fact that the sentences received by Hayles and Bullock under the conspiracy count are to run concurrently with the sentences received under the substantive counts. Although Waggoner was convicted on the conspiracy count only, he did not participate in the taped conversations and has no standing to complain about the introduction of them into evidence. Mullins likewise did not participate in the taped conversations, and, in addition, the sentences received by him under the conspiracy count and the substantive counts are to run concurrently. See Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

8. See, e. g., United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed. 2d 684 (1965).

9. 428 F.2d 1152, 1155 (5th Cir. 1970).

10. See, e. g., United States v. Judice, 457 F.2d 414, 417 (5th Cir. 1972).

counterfeiting operation; from this evidence it can readily be inferred beyond a reasonable doubt that Hayles knew he was passing counterfeit money when caught in Mabank.

We have considered all of the contentions of each of the four appellants, Hayles, Mullins, Bullock and Waggoner and find them to be without merit. They received a fair trial, and there was overwhelming evidence of their guilt.

For the foregoing reasons the judgment of the district court is affirmed.