UNITED STATES of America, Plaintiff-Appellee,

v.

Floyd F. CAPO, Amos Lisenby, Cody Lisenby, Tim Williams, John Booker, Defendants-Appellants.

No. 80–5903.

United States Court of Appeals, Eleventh Circuit.

Dec. 20, 1982.

Rehearing Denied Jan. 12, 1983.

Opinion on Granting of Rehearing En Banc March 3, 1983.

James P. Judkins, Tallahassee, Fla., for Capo.

E.C. Deeno Kitchen, Tallahassee, Fla., for A. Lisenby.

Leo A. Thomas, Charles J. Kahn, Jr., Pensacola, Fla., for C. Lisenby.

J. LaDon Dewrell, F. Lloyd Blue, Jr., Fort Walton Beach, Fla., for T. Williams.

John R. Weed, Conrad C. Bishop, Jr., Perry, Fla., for Booker.

David L. McGee, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, HILL and FAY, Circuit Judges.

PER CURIAM:

All appellants were convicted of conspiracy to possess marijuana with intent to distribute and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1). The convictions of all appellants are affirmed.

All judges concur in Parts I–V of the opinion of the court written by Chief Judge Godbold. Judge Hill concurs in Part VI, written by Judge Fay. Chief Judge Godbold dissents from Part VI, insofar as it concerns Amos Lisenby; he has filed a dissenting opinion thereto, and would reverse the conviction of Amos Lisenby.

\* \* \* \* \* \*

GODBOLD, Chief Judge:

### I. The facts

Government operative Carlisle, posing as a seafood broker with organized crime connections, met appellant Capo under the pretext of arranging a large seafood transaction. Carlisle introduced Capo to undercover government agents who also supposedly had organized crime connections. Capo indicated an interest in drug smuggling. A series of meetings and telephone calls ensued. Unbeknownst to Capo, many of these conversations were monitored and recorded.

Capo agreed to supply a load of marijuana to Carlisle, to be brought by boat from Colombia, South America and delivered to an off-loading site supplied by Carlisle near Freeport, Florida.[1] Capo wanted to keep a low profile in the operation and told Carlisle he would send a man using the name "Jake" to handle the arrangements.

"Jake", identified at trial as appellant Tim Williams, met with Carlisle and an agent a few days later and discussed in detail arrangements for the delivery. But the initial plan did not work out; the boat to Colombia returned empty. Capo, in a recorded phone conversation, told Carlisle not to worry because another load would

1. Freeport is located on the northwestern Flori- da coast off the Intercoastal Waterway.

probably arrive in a week or so. A few days later "Jake" told Carlisle he had a load for him, and the two made new delivery arrangements. Carlisle would supply "Jake" with a truck to be loaded with marijuana and returned to Carlisle at his motel in DeFuniak Springs, Florida.[2] Carlisle telephoned Capo and told him that "Jake" had gotten Carlisle some marijuana to which Capo replied, "I know." The next day the truck was dispatched and returned that night with approximately 4000 pounds of marijuana. This marijuana had been brought in from Jamaica in a boat owned by Capo's son-in-law Danny Stewart and stored overnight in a warehouse near Panama City, Florida.[3] "Jake" (Williams), appellant Booker who was seen earlier driving the truck, Vern Oblisk, and others were arrested at a motel when the delivery was made. Capo was arrested the following day.

On the night of the delivery a marine patrol officer was conducting surveillance of the Panama City warehouse where the marijuana was stored. The officer saw appellant Amos Lisenby get out of a van looking hot and sweaty. After Amos left the van, the officer approached and saw what appeared to be marijuana residue on the bumper. The officer searched the van and found more residue inside. Amos was arrested the following afternoon and charged with simple possession of marijuana in violation of 21 U.S.C. § 844. This charge was later dropped and Lisenby was indicted along with the other appellants.

Oblisk, a lookout in the Capo/Williams/Carlisle operation, began cooperating with the government soon after his arrest. He recorded several telephone calls he made to appellant Cody Lisenby. He then arranged a meeting, also recorded, between himself and Amos and Cody Lisenby. These recorded conversations along with Oblisk's trial testimony implicated the Lisenby brothers in the deal as part of the

crew that transferred the marijuana from Stewart's boat to the warehouse. Cody Lisenby was arrested shortly after the meeting with Oblisk.

## II. One or two conspiracies, severance and joinder

Appellants urge that joinder was improper because there were two separate conspiracies, an abortive deal for Colombian marijuana and a completed deal for Jamaican marijuana. They contend that, while Williams as "Jake" was involved in both deals, there was no agreement between Capo and the remaining appellants. Viewing the evidence in the light most favorable to the government, we find that the jury could have concluded that one continuing conspiracy existed. The link between Capo and the ultimate delivery does not necessarily rest solely on mere awareness of criminal activity nor simply on association with those engaged in criminal activity. This is not a case where the acts planned differ substantially from the acts completed. Capo promised marijuana; marijuana was delivered. It was to come in by boat to Freeport. It came by boat to Panama City, 35 miles away. Capo indicated an expected delivery date about a week in the future; six days later marijuana arrived. Capo said his man "Jake" would take care of the arrangements; "Jake" did. When coupled with Capo's knowledge of the change in plans and his familial relationship with the person bringing in the marijuana from Jamaica, the jury had ample reason to conclude appellants participated in a single conspiracy as charged. A single conspiracy is not divisible simply because of personnel changes, *U.S. v. Pool*, 660 F.2d 547, 562 (5th Cir.1981) (Unit B); it does not become divisible because of the changes in the plan by which, after the Colombian shipment aborted, a Jamaican cargo was substituted. That all the participants did not know each other does not prevent the existence of a conspiracy. *See U.S. v. Watson*, 669 F.2d

---

**2.** DeFuniak Springs is inland about 25 miles north of Freeport. See note 1 *supra*.

**3.** Panama City is a seaport in northwestern Florida.

1374, 1379 (11th Cir.1982). It is enough that each one knew of the conspiracy and voluntarily participated in it. *Id.* at 1380.

■ Appellants also contend they were prejudiced by being tried jointly because of antagonistic defenses and a prejudicial overspill in the evidence. Appellants fail to show an irreconcilable conflict of defenses as required for reversal by *U.S. v. Herring,* 602 F.2d 1220, 1225 (5th Cir.1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980); and we see no antagonism at all. All of the defenses centered on disassociating Capo from the completed delivery. As for overspill of evidence, merely showing some prejudice from the joint trial is not enough. *U.S. v. Dohm,* 597 F.2d 535, 539 (5th Cir.1979), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 196 (1979). Appellants must demonstrate compelling prejudice. *See id.* They have not. As in most joint trials, some participants were shown to have participated more extensively than others.

### III. Prosecutorial misconduct, excessive government involvement

Appellants seek reversal based on a long list of purported bad acts by the government in the investigation and prosecution of the case. A few of these issues we discuss. Others may be disposed of summarily, some without comment.

■ In rebuttal to defendants' closing argument, the prosecutor said to the jury: "Did you ever hear Mr. Capo tell anyone in here 'I was only kidding'." Capo contends this was an improper comment on his right to remain silent; the government contends the remark was a reference to what Capo said and did not say in the tape-recorded conversations in evidence. Since it cannot be said that the prosecutor's manifest intention was to comment on Capo's failure to testify, or that the remark was of such character that the jury would naturally and necessarily take it to be such a comment, reversal is not required. *See U.S. v. Ro-*

*chan,* 563 F.2d 1246, 1249 (5th Cir.1977). Moreover, the district judge immediately gave a curative instruction. *See U.S. v. DeSimone,* 660 F.2d 532, 543 (5th Cir.1981) (Unit B), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1981).

■ The prosecutor commented in closing argument that the trial of alleged co-conspirator Deral Holman would begin the next day, a fact that had not been introduced into evidence. This remark was made in response to a defense jury argument implying that Holman was not to be tried. In these circumstances the statement did not unfairly prejudice appellants. *See U.S. v. Henley,* 502 F.2d 585 (5th Cir. 1974).

■ Appellants challenge various characterizations of themselves and their counsel made by the prosecutor, the principal one being a description of Capo as "sinister." The transcript shows that the prosecutor in closing argument referred to Capo as "sinister." The prosecutor maintains this is a transcription error and the word actually used was "sincere." The reference, whether "sinister" or "sincere," was to how Capo sounded on the tape recordings the jury had heard. Capo did not object. Characterizing Capo as sounding "sinister," if it occurred at all, does not amount to plain error where the characterization was based on evidence adduced at trial and the jury could readily evaluate the accuracy of the characterization. *See U.S. v. Webb,* 463 F.2d 1324, 1328 (5th Cir.1972). Other characterizations challenged were cured by the district judge's instructions or do not merit any discussion.

The argument that the prosecution violated appellants' due process rights by acting in bad faith in pursuing this case is totally meritless.

■ Capo contends that the conduct of investigatory personnel was so excessive that it deprived him of due process. He maintains he was physically coerced into

playing along with their wishes because they represented themselves as having organized crime connections. Capo asserts he was subjected to veiled threats by the agents after they claimed to have "fixed" his parole revocation problem.[4] He argues they then expected him to repay the favor by supplying them with drugs. He also urges he was economically coerced by the government because in reliance on agents' representations that they wanted to make a major seafood purchase he invested substantial money in pursuit of this bogus deal.

Government involvement in criminal schemes can be so "outrageous" that it offends due process. *See Hampton v. U.S.,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *U.S. v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973); *U.S. v. Gray,* 626 F.2d 494 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1367, 67 L.Ed.2d 346 (1981). No such outrageous conduct appears in this case. Government infiltration of criminal activity is a permissible means of investigation. *U.S. v. Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. While investigating, government agents may provide illegal goods or services without necessarily engaging in misconduct. *See Hampton v. U.S.,* 425 U.S. at 489, 96 S.Ct. at 1649. The test for whether official conduct reaches a constitutionally impermissible level turns on the totality of the circumstances with no single factor controlling. *U.S. v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981) (Unit B). The government's conduct here does not even approach that level of outrageousness case law suggests would be necessary for reversal. *See U.S. v. Bueno,* 447 F.2d 903 (5th Cir.1971) (government agent supplied defendant with heroin that he then sold to another government agent); *Greene v. U.S.,* 454 F.2d 783 (9th Cir.1971) (government agents supplied defendant with a still, raw materials for whiskey-mak-

ing, and then purchased the product). The evidence reveals that agents secured Capo's confidence by helping him with his parole problem. Once they had his confidence, it was Capo who suggested the marijuana transaction. Agents then provided him the opportunity to commit the crime. They did not provide him the means to do so. Agents did encourage Capo to believe that Carlisle would purchase a large amount of seafood from Capo in a completely legal transaction. Even if the scope of agents' activities concerning the seafood purchase was arguably improper, these activities alone do not warrant reversal. It was Capo who first proposed supplying Carlisle with marijuana, and Capo made this proposal weeks before Capo could have reasonably relied on the seafood transaction coming to fruition.

IV. Evidence of extrinsic crimes

 Testimony was presented during the trial concerning conversations between Capo and government agents in which Capo discussed a variety of bad acts other than the ones charged. He offered to bribe the local sheriff and bring in a load of cocaine for an agent. He proposed supplying Carlisle with drugs by stealing some marijuana from a local jail. He discussed bribing officials to solve his parole revocation problems. At trial Capo's defense was that he was coerced into agreeing to supply Carlisle with marijuana. Evidence of Capo's willingness to help smuggle cocaine is relevant to the issue of intent raised by the defense. *See* Fed.R.Evid. 404(b). Capo's proposal to steal marijuana is also relevant to the issue of intent. This latter evidence also tends to rebut the defense argument that the delivery of Jamaican marijuana rather than Colombian marijuana was a significant departure from Capo's agreement with Carlisle by showing it was marijuana generally that was the focus of

---

4. When this investigation began, Capo was on parole and faced impending revocation proceedings. The evidence shows that Capo asked agents if they could "fix" his parole problem. The government delayed action on Capo's pa-

role violation so the investigation could continue. The agents led Capo to believe this was achieved through the influence of a fictional criminal boss "Uncle Angelo."

the deal rather than Colombian marijuana. Since Capo asserted in his defense that he felt obligated to supply agents with drugs because they "fixed" his parole problems, no prejudice to Capo resulted from the testimony about the bribery of parole officials. One of the government's witnesses mentioned a party at Capo's house where drugs were used and the sheriff was present. The district judge immediately instructed the jury to disregard this testimony, so that the error was not reversible.

■ Twice during trial the government referred to Williams' claim to agents that he had brought in 39 other loads of drugs. The first mention of this was by testimony during the government's case-in-chief. Any error from this was cured by the district judge's prompt curative instruction to the jury. The second reference to the 39 other loads was made by counsel in closing argument. We do not condone this remark, but it was invited by defense counsel's argument that Williams participated in this deal because he feared the agents' organized crime connections. Viewed in the totality of the circumstances this remark was not unfairly prejudicial to appellants. *See U.S. v. Henley,* 502 F.2d 585 (5th Cir.1974).

### V. Booker's remaining contentions

Appellant Booker raises other issues that may be disposed of briefly.

■ Agents seized Booker's van along with seizing the marijuana and arresting participants at the motel. They took the van to the station and searched it. No warrant was obtained. Photographs of electronic equipment found in the search were introduced at trial. Testimony showed that agents observed Capo's son-in-law driving this van, which accompanied the truck Carlisle provided on the trek to obtain the marijuana. Thus there was ample cause to connect the van with the marijuana. Agents could properly have searched the van on the spot without a warrant because probable cause existed to

believe the van contained contraband. *See U.S. v. Ross,* —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Instead they took it to the jail and searched it there. If a warrantless search of a vehicle is permissible at the time of seizure, a search does not become improper because the vehicle is moved before the search is conducted. *See Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Opening the van's icebox, which, after it was opened, was found to contain electronic equipment, was a permissible search of a closed container within a vehicle under *U.S. v. Ross, supra.* The outward appearance, size and apparent nature of the icebox were such that an officer, with probable cause to search the van for marijuana, might reasonably believe that it was a place where marijuana could be found. We need not discuss the propriety of agents opening a suitcase found in the van since none of its contents were introduced into evidence.

■ The district judge limited the scope of Booker's questions on re-cross examination of Oblisk. Since the questions attempted would have exceeded the scope of direct examination, we find no abuse of discretion in the district judge's limitation.

■ The contention that the district court erred in sentencing Booker to a special parole term is frivolous. The special parole term was imposed under count II of the conviction. This count deals with the substantive offense of possession of marijuana with intent to distribute. 21 U.S.C. § 841 specifically authorizes special parole terms.

Booker's assertions that the evidence at the *James* hearing was insufficient to show a single conspiracy is meritless. *See* Part II *supra.*

■ The argument that Booker's post arrest statement to agents was improperly admitted is without merit. This statement was offered by a co-defendant with the assent of Booker's counsel.

**1338**

FAY, Circuit Judge:

### VI. The Lisenbys' conversations

Both Amos and Cody Lisenby claim that the district court's refusal to suppress recorded conversations made by Vern Oblisk requires reversal under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Judges Hill and Fay are in agreement that there is no merit to this contention.

Cooperating with the government, Oblisk made several calls to Cody Lisenby which were recorded and had a meeting with the two Lisenbys which was taped and secretly watched by agents. The meeting occurred approximately two weeks after Amos Lisenby had been arrested on the possession charge related to the marijuana in the van. Amos was then out on bail and had retained counsel with the government's knowledge. Approximately two weeks after the meeting, both Lisenbys were indicted for conspiracy to possess marijuana with intent to distribute and possession of marijuana with intent to distribute, 21 U.S.C. §§ 846 and 841(a)(1). The possession of marijuana in violation of 21 U.S.C. § 844 charge against Amos Lisenby was dropped. The tape of the meeting with Oblisk was important evidence in the government's case against both Lisenbys.

In *Massiah v. United States, supra,* Massiah was indicted on a conspiracy to possess narcotics charge. He retained counsel and was released on bail. His co-defendant chose "to cooperate with the government agents in their continuing investigation of the narcotics activities" in which Massiah, a co-defendant, and others allegedly had been engaged. *Id.* at 202, 84 S.Ct. at 1200. The co-defendant's car was wired, and Massiah and the co-defendant had a conversation in the car to which an agent listened. At trial the listening agent testified to incriminating statements Massiah had made in the conversation. The Supreme Court held that the Sixth Amendment guarantee of counsel was violated "when there was used against [Massiah] at his trial evidence of his own

incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."

In *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Court rejected a claim that Hoffa's sixth amendment rights were violated because the alleged intrusion upon Hoffa's relationship with his attorneys occurred in connection with a charge of jury tampering that had arisen during Hoffa's trial on Taft-Hartley charges; the "statements related to the commission of a quite separate offense." *Id.* at 308, 87 S.Ct. at 416.

The conjunction between *Massiah* and *Hoffa* is a gray area, which several Circuits have attempted to chart. In *United States v. Missler*, 414 F.2d 1293 (4th Cir.1969), a defendant indicted on a highjacking charge made a contract with a trigger man to kill a co-defendant expected to testify for the government. The trigger man informed police and a meeting was arranged at which the police listened to the contract being confirmed. The defendant was indicted and convicted for obstruction of justice. The Court concluded that *Massiah* was not applicable and held

> The pendency of an indictment for one offense does not immunize a defendant from accountability for statements made after indictment in the commission of another crime, nor does it shield him from testimony concerning them.

*Id.* at 1303. The court further noted that even if the right to counsel had been infringed it would be infringed only as to the then pending highjacking prosecution and there would be no entitlement "to suppression of evidence bearing upon an entirely new, subsequent offense." *Id.* The Fourth Circuit recently adhered to *Missler* in *United States v. Calhoun*, 669 F.2d 923 (4th Cir.1982).

The First Circuit has followed the logic of *Missler*. In *Grieco v. Meachum*, 533 F.2d 713 (1st Cir.1976), the court considered the habeas corpus petitions of six men challeng-

ing their Massachusetts state court convictions for crimes relating to a 1965 murder. Casseno was incarcerated pending trial for murder. A fellow inmate approached Glavin, also an inmate and under life sentence, and offered to pay Glavin to confess to the murder for which Casseno was charged. Glavin reported the offer to government agents and cooperated with them. They told him to pretend to go along with the plan and talk with Casseno himself. Glavin did so, and talked with Casseno three times. At the trial of Casseno on the murder charge, Glavin testified to statements made to him by Casseno in these conversations, confirming the intermediary's offer. Presumably the testimony was admitted as admissions of a defendant by conduct tending to show consciousness of past crimes. The First Circuit held that *Massiah* was not applicable because Casseno's statements were "primarily uttered in the commission of another substantive offense, subornation of perjury, and were only incidentally admissible in his trial on the pending indictment." *Id.* at 717.

Neither the Eleventh nor Fifth Circuits have squarely confronted this issue. In *United States v. Hayles,* 471 F.2d 788 (5th Cir.1973), the court considered the admissibility of surreptitious tapes made when "charges had been filed in two other districts with respect to some of the same overt acts for which [the defendants] were eventually tried under the conspiracy count of the indictment in this case." *Id.* at 792. While the court found that "possible error" resulted from the admission of the tapes, it declined to reverse the convictions since any error would have been harmless beyond a reasonable doubt.

The facts of the instant case are covered by the umbrella of *Hoffa* rather than *Massiah.* Amos Lisenby had been arrested for simple possession of marijuana, the residue in the van, and charged with a misdemeanor which was later dismissed. While the van and residue marijuana were somewhat related to the conspiracy and possession

with intent to distribute offenses later charged, such a tenuous relation is insufficient to immunize the Lisenbys from investigation. Had Amos Lisenby been arrested for speeding enroute to the warehouse, such an arrest would be tangentially related to the conspiracy, but would certainly not be grounds for excluding the conversations later recorded surreptitiously.

In a technical, legal and very real sense, the conspiracy and possession with intent to distribute crimes were separate and distinct from the simple possession charge forming the basis of Amos Lisenby's arrest. Factually, the residue of marijuana giving rise to the arrest was distinct from the marijuana which formed the basis of the possession with intent to distribute conviction as well as the basis of the conspiracy conviction, *i.e.,* the marijuana stored in the warehouse. In fact, the district court did not admit into evidence the van residue marijuana. Further, the conversations recorded after the arrest for simple possession were not introduced in the trial of that charge, which was dropped.

During the investigation of any prolonged conspiracy involving numerous individuals, many acts of a criminal nature may be committed. An arrest for such a substantive offense surely cannot be grounds for precluding the use of otherwise admissible evidence gathered as the investigation of the conspiracy continues and other substantive offenses also occur. *Massiah* protects the defendant as to the crime for which he has been charged and arrested. There is nothing unfair about gathering evidence as to other criminal activity. To hold otherwise would be to immunize a defendant from acceptable investigations in connection with other suspected activity, or to allow subsequent investigation only in the rare case when such activities are wholly unrelated to the acts upon which the arrest is based. *Massiah* does not compel such a result. The court therefore agrees with the district court's refusal to suppress the conversations recorded by Vern Oblisk.

As to Cody Lisenby, all judges find the conversations admissible. Both federal and Florida statutes expressly permit the interception of phone calls where one of the parties to the communication has given prior consent. 18 U.S.C. § 2511(2)(c); Fla. Stat. 934.03(2)(c) (the Florida prior consent provision applies only where the person is a government agent). That Lisenby was speaking on a telephone located within his home does not make the seizure of his voice an unreasonable intrusion on the privacy of the home. Lisenby knowingly projected his voice outside the confines of his home by using the telephone. His voice was intercepted and recorded at Oblisk's location. Thus his reliance on the more protective privacy provisions of the Florida constitution as articulated in *State v. Sarmiento,* 397 So.2d 643 (Fla.1981) is misplaced.

\* \* \* \* \* \*

The convictions of all appellants are AFFIRMED.

GODBOLD, Chief Judge, dissenting:

I would hold that *Massiah v. U.S.,* 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964), requires reversal as to Amos Lisenby. Massiah was indicted on a conspiracy to possess narcotics charge. He retained counsel and was released on bail. His co-defendant chose "to cooperate with the government agents in their continuing investigation of the narcotics activities" in which Massiah, a co-defendant, and others allegedly had been engaged. *Id.* at 202, 84 S.Ct. at 1200. The co-defendant's car was wired, and Massiah and the co-defendant had a conversation in the car, to which an agent listened. At trial the listening agent testified to incriminating statements Massiah had made in the conversation. The Supreme Court held that the Sixth Amendment guarantee of counsel was violated "when there was used against [Massiah] at

his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."

In this case, shortly after his arrest Oblisk agreed to cooperate with the government. He was given the mission of getting the Lisenbys to persuade their uncle, Deral Holman, to pay to him [Oblisk] money allegedly owing to Oblisk from the marijuana conspiracy and to turn this money over to government agents for fingerprinting. For this purpose Oblisk made numerous calls to Cody Lisenby, and a meeting between Oblisk and the two Lisenbys was set up. Oblisk's calls were recorded and agents secretly watched and taped the meeting. After the meeting Holman made a partial payment. The meeting occurred approximately two weeks after the indicted conspiracy defendants had been arrested and a like period since Amos had been arrested on the possession charge. Neither Amos nor Cody had been indicted on the conspiracy charge, but about a week before the meeting with Oblisk the government had decided to seek an indictment against Amos. At the time of the meeting Amos was out on bail on the possession charge. He had retained counsel, and the government knew it.

Approximately two weeks after the meeting with Oblisk both Lisenbys were indicted and arrested. The possession charge against Amos was dropped, whether before or after indictment we do not know. The tape of the meeting with Oblisk was key evidence in the government's case against both Lisenbys.

Thus the statements made in this case were, as in *Massiah,* "[Amos's] own incriminating words." Government agents had "deliberately elicited" the words from him, after he had been arrested [5] and in the absence of his counsel.

The government contends *Massiah* does not apply because Amos had been taken

---

**5.** It is not significant that the arrest was pursuant to a complaint rather than an indictment.

*See Clifton v. U.S.,* 341 F.2d 649 (5th Cir.1965).

into custody on a separate charge rather than the conspiracy charge that was under investigation and for which Amos was later indicted and tried, and the majority accept this argument. The majority rely on *U.S. v. Missler,* 414 F.2d 1293 (4th Cir.1969), *Grieco v. Meachum,* 533 F.2d 713 (1st Cir. 1976) and *U.S. v. Hoffa,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). In *Missler,* the defendant was indicted on a hijacking charge. He made a contract with a trigger man to kill a co-defendant who defendant thought had given police the details of the hijacking. The trigger man informed police, and a meeting was arranged, with police listening, at which the contract was confirmed. Defendant was indicted and convicted for obstruction of justice based upon the contract transaction. The court held *Massiah* was not applicable because the obstruction of justice offense was distinct and separate and committed after the hijacking indictment.

In *Grieco,* a prisoner named Casseno was charged with murder. A fellow inmate approached Glavin, also an inmate and under life sentence, and offered to pay Glavin to confess to the murder for which Casseno was charged. Glavin reported the offer to government agents and cooperated with them. They told him to pretend to go along with the plan and talk with Casseno himself. Glavin did so, and talked with Casseno three times. At the trial of Casseno on the murder charge Glavin testified to statements made to him by Casseno in these conversations that confirmed the intermediary's offer. Presumably the testimony was admitted as admissions of a defendant by conduct tending to show consciousness of past crimes. The First Circuit held that *Massiah* was not applicable because Casseno's statements were "primarily uttered in the commission of another substantive offense, subornation of perjury, and were only incidentally admissible in his trial on the pending indictment."

Similarly, in *U.S. v. Hoffa,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the alleged intrusion upon the defendant's relationships with his attorney came in connection with a charge of jury tampering that had arisen from events occurring during Hoffa's trial on Taft-Hartley law charges.

The present case does not belong within the exception to *Massiah* established by these "separate offense" cases. The factual relationship between the conspiracy umbrella and the more specific charge against Amos for simple possession is apparent. Amos's arrest arose out of events that occurred at the Panama City warehouse where the shipment of marijuana from Jamaica was stored overnight, and on the night that the marijuana was taken from the warehouse and delivered to Carlisle. The arrest resulted from observations of a marine patrol officer watching the warehouse as part of the investigation of the marijuana stored there. A van pulled up and the officer saw Amos get out of the van looking hot and sweaty. The officer approached the van and saw what appeared to be marijuana residue on the bumper, searched the van, and found more residue inside. Amos was arrested the following afternoon.

At least until it found itself in difficulty in a *Massiah* hearing the government contended that the possession charge and the conspiracy charge were either overlapping or congruent. After Amos was indicted on the conspiracy charge he asked for a bill of particulars, and the government responded with a copy of the complaint on which Amos had been arrested on the possession charge. And as we have already pointed out, before the meeting with Oblisk occurred, the government already was seeking an indictment against Amos on the conspiracy charge.

At trial the *Massiah* hearing was conducted outside the presence of the jury. The judge considered the admissibility of both the marijuana found in the van and the tapes. In support of its position that the "van marijuana" was admissible the government contended that it was related to the conspiracy, i.e., that the residue's presence in the van near the warehouse on the night of the delivery circumstantially linked the residue to the marijuana within the warehouse. The judge pointed out to the government that it could not have it both ways, that is, it could not put the van marijuana in evidence on the ground it was part of the conspiracy and put the tapes in evidence on the ground the conspiracy was

a separate offense from the possession offense on which Amos was represented by counsel. The judge concluded that he would suppress the van marijuana but "in view of the fact that this was an ongoing criminal conspiracy, I am going to permit the tapes to be played."

Of course, whether a conspiracy was ongoing and an investigation ongoing were two different matters. The existence of an ongoing *investigation* as a justification for intruding into the Sixth Amendment right of the accused to counsel was raised and rejected in *Massiah* itself.

The Solicitor General, in his brief and oral argument, has strenuously contended that the federal law enforcement agents had the right, if not indeed the duty, to continue their investigation of the petitioner and his alleged criminal associates even though the petitioner had been indicted. He points out that the Government was continuing its investigation in order to uncover not only the source of narcotics found on the S.S. Santa Maria, but also their intended buyer. He says that the quantity of narcotics involved was such as to suggest the petitioner was part of a large and well-organized ring, and indeed that the continuing investigation confirmed this suspicion, since it resulted in criminal charges against many defendants. Under these circumstances the Solicitor General concludes that the government agents were completely 'justified in making use of Colson's cooperation by having Colson continue his normal associations and by surveilling them.'

We may accept and, at least for present purposes, completely approve all that this argument implies, Fourth Amendment problems to one side. We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial.

377 U.S. at 205–06, 84 S.Ct. at 1202–1203.

With respect to an ongoing *conspiracy* as a predicate for an exception to *Massiah,* the marijuana had been seized and numerous participants in the conspiracy arrested two weeks before the Oblisk-Lisenby meeting. The conspiracy was ongoing only to the extent that the government arranged for it to continue by instructing Oblisk to deal with the Lisenbys in pursuit of Holman. Thus, this court must consider whether, after Amos's Sixth Amendment right to counsel guaranteed under *Massiah* had been triggered, the government could bring itself within the "separate and distinct offense" exception to *Massiah* by, first, arranging for an informer to meet with Amos in the absence of his counsel and then asserting that the occurrence of that meeting and the statements made there were part of an ongoing conspiracy. It would be anomalous indeed if the government could *create* a "separate and distinct offense" exception to the requirement of the *presence* of counsel by dealing with the suspect in the *absence* of his counsel. But this is what the government says it can do. "It is the position of the government that these statements [by Amos to Oblisk] are admissible because they were made as a result of an investigation of a different crime than the defendant had been arrested on *and because the statements themselves were a part of the charged conspiracy.*" Government brief p. 23. This manipulation of *Massiah* should not be permitted.

The government has cited to us no case comparable to this one. In *Grieco* the incriminating statements uttered by the accused in the absence of his counsel were merely incidental to the charge on which he was on trial. Here, the statements were used as key evidence in the charge on trial, and they were not secured in the commission of an offense separate from that on trial but in alleged commission of that very offense. *Missler* and *Hoffa* are like this case in that the statements heard in the absence of counsel related to the charge on trial, but in each case the charge on trial was truly separate from that on which defendant had retained counsel, hijacking versus killing a witness in *Missler,* Taft-Hartley versus jury tampering in *Hoffa.* In both cases the "uncounselled statement offense" was neither congruent with nor overlapping of the essential facts of the "counselled offense." Here, the "counselled offense" and the "statement in absence of counsel offense" are congruent or overlapping in fact, were treated by the government to be so, and were considered by the district court to be so.

However well intentioned the government's investigative efforts may have been, they cannot override Amos's Sixth Amendment right that the government may not intrude upon his relation with his attorney by inspiring interrogation of him in the absence of his counsel.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

BY THE COURT:

A member of this Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by this Court en banc *with* oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of en banc briefs.